IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CROSSVILLE, INC., ) | |
| ) | |
|    Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:09-0120 |
| ) | Judge Trauger |
| KEMPER DESIGN CENTER, INC., ) | |
| JEROME H. BERKEMEYER, ) | |
| JIM BERKEMEYER, AND ) | |
| EDWARD SPAR, ) | |
| ) | |
|    Defendants. ) | |

## MEMORANDUM

Pending before the court is plaintiff Crossville, Inc.'s Motion for Judgment on the Pleadings (Docket No. 8), the Response filed by defendants Kemper Design Center, Inc., Jerome H. Berkemeyer, Jim Berkemeyer, and Edward Spar (Docket No. 10), and the plaintiff's Reply (Docket No. 11). For the reasons discussed below, the plaintiff's motion will be denied.

## BACKGROUND

Kemper Design Center, Inc. ("Kemper") is a defunct company that sold ceramic tile, stone, and granite countertops.[1] (Docket No. 10 at 1-2.) On February 29, 2008, it signed a promissory note (the "First Note") with Crossville, Inc. ("Crossville") for $239,479.29, representing money that Kemper owed on outstanding invoices for products from Crossville.

---

[1] Unless otherwise noted, the facts are drawn from the plaintiff's Complaint and accompanying documents (Docket No. 1) and the defendants' Answer (Docket No. 5).

1

This note was payable over a twelve-month period in monthly installments of $19,956.60, plus interest.

The First Note was accompanied by personal guaranties from the three shareholders of Kemper: Jerome Berkemeyer, Jim Berkemeyer, and Edward Spar ("the Guarantors"). The guaranty agreements[2] state, in relevant part: "This Guaranty shall be continuing, absolute and unconditional, and shall apply to and cover all renewals, extensions and modifications of the Indebtedness."[3] (Docket No. 1, Exs. 3-5 at 2.)

---

[2] The Guarantors signed separate but identical guaranty agreements, and Crossville attached each guaranty agreement to its Complaint. (Docket No. 1, Exs. 3-5.) Because they are identical, the court will refer to the guaranty agreements collectively as the "Guaranty."

[3] "Indebtedness" is defined as:

> (a) All indebtedness and obligations now or hereafter evidenced by or owing pursuant to the Promissory Note dated February 29, 2008, in the original principal amount of $239,479.29 executed by [Kemper] to [Crossville], whether principal, interest, or otherwise.
>
> (b) All indebtedness and obligations of Debtor now or hereafter evidenced by or owing pursuant to any and all other instruments and documents now or hereafter evidencing or securing the indebtedness and obligations owing by [Kemper] to [Crossville] pursuant to the above Promissory Note.
>
> (c) The full and prompt payment of all costs and expenses of whatever kind and nature incident to collection of the indebtedness evidenced by any of the foregoing, the enforcement or protection of any rights of Lender thereunder, and the exercise by [Crossville] of any rights and remedies thereunder, including but not limited to the payment of reasonable attorneys' fees.

(Docket No. 1, Exs. 3-5 at 2.)

Kemper made its first ten payments as scheduled, but a declining economy disrupted the company's cash flow with two months of payments remaining on the First Note. (Docket No. 10 at 4.) Kemper and Crossville then negotiated a new promissory note ("the Second Note") for $174,403.32, which included the final two payments from the First Note and a significant amount of additional principal for other products Kemper had purchased since the First Note was signed.[4] (*Id.*) Jerome Berkemeyer, on behalf of Kemper, signed the Second Note on December 31, 2008. The Guarantors did not sign new personal guaranties.

Kemper soon defaulted on the Second Note, and Crossville filed this suit, claiming breach of contract and seeking the full unpaid amount on the Second Note from the Guarantors. The Second Note provides that it "replaces and modifies that certain Promissory Note of Kemper to Crossville, dated February 29, 2008, in the original principal amount of $239,479.29." (Docket No. 1, Ex. 2 at 4.) Crossville asserts that the Guaranty applies to the full amount of the Second Note because the Second Note is a "modification" of the First Note.

The defendants' Answer admits the accuracy of the content of the relevant agreements. They argue, however, that the Guaranty only applies to the amount from the First Note and that the increase in principal reflected in the Second Note is not a "modification."[5]

---

[4] The exact amount of additional principal is unclear from the record, but in their brief the defendants claim that it was $114,474.58. (Docket No. 10 at 4.) Ultimately, it is not important to determine a precise amount at this stage. The plaintiff does not dispute that two monthly payments of $19,956.60 remained on the first principal amount of $239,479.29. Even considering the interest on that amount, it is clear that a large amount of principal was added.

[5] The defendants do not dispute that Kemper is liable for the full amount of the Second Note, or that the Guarantors are liable for the unpaid portion of the First Note that was incorporated into the Second Note.

3

## ANALYSIS

Crossville has filed a Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c), seeking judgment on its claim that the Guarantors are personally liable for Kemper's breach of the Second Note.[6]

## I. Motion for Judgment on the Pleadings Standard

Federal Rule of Civil Procedure 12(c) allows parties to move for judgment on the pleadings once the pleadings are closed, as long as the motion will not delay trial. Fed. R. Civ. P. 12(c). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). The court cannot consider any evidence outside of the pleadings, Fed. R. Civ. P. 12(d), and the non-moving party's legal conclusions or factual inferences need not be accepted as true. *Source Assocs. v. Valero Energy*

---

[6] The defendants object to Crossville's motion because they argue that it "is tantamount to a motion for partial summary judgment," in violation of the Case Management Order. (Docket No. 10 at 1.) The Case Management Order does require the parties to seek leave before filing a partial summary judgment motion (Docket No. 6 at 7), but the pending motion is for judgment on the pleadings, not for summary judgment. These are distinct motions; for example, a motion for judgment on the pleadings forbids consideration of evidence outside the pleadings. Fed. R. Civ. P. 12(d).

Crossville has not submitted, and the court will not consider, any materials outside of the pleadings. The two Notes and the Guaranty are included as part of the pleadings, however, because "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Thus, the court may consider these documents in determining whether Crossville's motion should be granted.

In their brief, the defendants have included evidence outside the pleadings, including affidavits from the Guarantors. (Docket No. 10, Exs. 1-3.) For the reasons discussed above, the court will not consider this evidence when construing the First Note.

*Corp.*, 273 Fed. Appx. 425, 427 (6th Cir. 2007); *see also Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999).

"A Rule 12(c) motion 'is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" *Winget*, 510 F.3d at 582 (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991)). Thus, the court will grant the plaintiff's motion if (1) the admissions in the defendants' Answer entitle the plaintiff to judgment as a matter of law, and (2) the defendants' affirmative defenses do not require factual development.

## II. Whether the Guaranty Unambiguously Applies to the Second Note

The crux of the present dispute is whether the Guaranty, which applies to "modifications" of the indebtedness from the First Note, covers the Second Note, which added a significant amount to Kemper's outstanding principal. The court must determine whether this addition of principal is a "modification" of the First Note.

Under Tennessee law, the interpretation of written documents, like the agreements at issue in this case, is a matter of law appropriate for the court to decide.[7] *See, e.g., Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). "A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Id.* (citing *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005)).

The starting point for ascertaining the intent of the parties is to examine the plain meaning of the words to determine whether the language is ambiguous. *Id.* (citing *Planters Gin*

---

[7] All of the relevant agreements provide that Tennessee law governs. (Docket No. 1, Exs. 1-5.)

*Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002)). Generally, language in a contract is ambiguous when it is "susceptible to more than one reasonable interpretation." *Id.* A commercial guarantor, however, "shall be held to the full extent of his engagements," and "the rule in construing [guaranties] is that the words of the guaranty are to be taken as strongly against the guarantor as the sense will admit.'" *Samick Music Corp. v. Hoy*, No. M2008-00441-COA-R3-CV, 2008 Tenn. App. LEXIS 639, at *7 (Tenn. Ct. App. Oct. 22, 2008) (quoting *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)).

If a contract is ambiguous, then the court may consider parol evidence, including the contracting parties' statements and conduct, to "guide the court in construing and enforcing the contract." *Id.* at 612. (citing *Memphis Housing Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001)). Because the court cannot, on this motion, consider evidence outside the pleadings, the plaintiff's motion can only be granted if the contract unambiguously supports Crossville's interpretation.

Crossville argues that the language in the Guaranty indicates that the Guarantors are liable for the full unpaid amount of the Second Note. The Guaranty states that it "shall be continuing, absolute, and unconditional, and shall apply to and cover all renewals, extensions and modifications of the Indebtedness" of the First Note. (Docket No. 11 at 4.) Crossville asserts that the addition of principal to the Second Note is unambiguously included within the meaning of "modification."[8]

---

[8] Crossville does not argue that the additional principal is a "renewal" of the First Note. One sentence in Crossville's brief suggests that additions to the principal could be considered an "extension" (Docket No. 9 at 7), but the plaintiff fails to provide any support for this assertion. An "extension" connotes an addition of time for the performance of the First Note. *See* Black's

6

Even considering that the Guaranty must be construed strongly against the Guarantors, the court disagrees. The amount of the Second Note was more than four times the amount of remaining unpaid principal from the First Note, and it included at least $110,000 of additional principal. Because this was a major change to the debt that Kemper owed under the First Note, it does not unambiguously fall within the scope of "modification."[9]

First, Crossville's broad interpretation of "modification" is contrary to the word's dictionary definition. The Supreme Court directly addressed this issue when, in construing the FCC's "modification authority," it found that "modification" connotes a small, limited change. *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 225 (1994), *superseded by statute on other grounds*, Telecommunications Act of 1996, 47 U.S.C. § 160(a)(1), *as recognized in Boomer v. AT&T Corp.*, 309 F.3d 404, 408-09 (7th Cir. 2002). In *MCI*, a federal statute authorized the FCC to "modify" certain requirements binding on telecommunication companies. *Id.* at 224. The Court stated that "[t]he word 'modify' – like a number of other English words employing the root "mod-" . . . , such as 'moderate,' 'modulate,' 'modest,' and 'modicum,' – has a

---

Law Dictionary (8th ed. 2004) (defining "extension" as "1. The continuation of the same contract for a specified period. Cf. RENEWAL. . . . 4. A period of additional time to take an action, make a decision, accept an offer, or complete a task," and defining "extension agreement" as "[a]n agreement providing additional time for the basic agreement to be performed."). Thus, an addition of principal is not an extension.

[9] In support of this argument, Crossville points out that the Second Note states that it "replaces and modifies [the First Note]." (Docket No. 1, Exs. 3-5 at 4.) But the Second Note's characterization of itself as a "modification" of the First Note is not dispositive. The court must examine the Guaranty to ascertain the meaning of "modification" as it is used within that agreement. It is the intent of the parties to the Guaranty, not the intent of the parties to the Second Note, that the court must determine.

connotation of increment or limitation." *Id.* at 225. "Virtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion." *Id.*

Thus, the court concluded that the "small-scale world of 'modifications'" does not include "fundamental changes." *Id.* at 228-29; *see also Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1037 (6th Cir. 1995) ("[T]he word 'modification' 'connotes moderate change.'" (quoting *MCI Telecomms. Corp.*, 512 U.S. at 225)). By using its "modification authority" to make significant changes, the agency had gone "beyond the meaning that the statute can bear." *Id.* at 229.

Ostensibly in support of its position, Crossville provides two dictionary definitions of "modification." It cites Webster's II New College Dictionary, but the only relevant definition there is: "[a] *small* alteration, adjustment, or limitation."[10] (Docket No. 11 at 6 (emphasis added) (quoting Webster's II New College Dictionary 704 (1999)).) Obviously, this undermines the claim that a modification can be a significant change. Crossville also quotes Black's Law Dictionary, which defines "modification" alternately as "[a] change to something; an alteration" and "[a] qualification or limitation of something." (*Id.* at 5 (quoting Black's Law Dictionary 1020 (7th ed. 1999)).) Again, the latter definition undermines the plaintiff's position. Given Supreme Court precedent and the definitions quoted in the plaintiff's own brief, it is not at all clear that "modification" encompasses large-scale changes.

---

[10] The other, irrelevant definitions quoted in Crossville's brief are: "1. The act of modifying or state of being modified. . . . 3. *Biol.* A physical change in an organism because of environment or activity. 4. a. A change in a word as it passes from on [sic] language to another. b. The linguistic change of a morpheme from one construction to another." (Docket No. 11 at 6 (quoting Webster's II New College Dictionary 704 (1999)).)

Second, other sections of the Guaranty suggest that the parties did not intend to give the term "modification" a broad and all-encompassing meaning, such that it would include significant additions to the principal. Tennessee law provides that "[n]o single clause in a contract is to be viewed in isolation; rather, the contract is to be 'viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another.'" *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999) (quoting *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985)); *see also BFS Retail & Commer. Operations, L.L.C. v. Smith*, 232 S.W.3d 756, 759-60 (Tenn. Ct. App. 2007).

Paragraph Seven of the Guaranty indicates that the parties clearly contemplated that Kemper might borrow additional money from Crossville that would not be guaranteed by the defendants. It provides:

> The granting of credit from time to time by [Crossville] to [Kemper], *in excess of any amount to which right of recovery under this Guaranty is limited* and without notice to the undersigned, is hereby expressly authorized and shall in no way affect or impair this Guaranty. In the event the Indebtedness of Debtor to Lender *shall so exceed any amount to which this Guaranty is limited*, if any, any payments by Debtor or any collections or recovery by Lender from any sources other than this Guaranty may first be applied by Lender to any portion of the Indebtedness which exceeds the *limits* of this Guaranty.

(*Id.*, Exs. 3-5 at 3 ¶ 7 (emphasis added).)

Because this paragraph indicates that there was a limit to the amount of debt for which the Guarantors would be liable, it suggests that large increases do not fall within the realm of a "modification." It implies that Crossville and Kemper could not simply increase the amount of

9

guaranteed debt by signing additional, subsequent notes.

Third, it is a canon of interpretation that words in a list should be given separate meaning to avoid surplusage. *See Snodgrass v. Snodgrass*, 295 S.W.3d 240, 248 (Tenn. 2009) (stating the rule against surplusage as giving each word meaning and purpose to avoid rendering any word superfluous); *see also Ward v. Sun Valley Foods Co.*, 212 Fed. Appx. 386, 392 (6th Cir. 2006). Here, the Guaranty applies to "all renewals, extensions and modifications of the Indebtedness." (Docket No. 1, Exs. 3-5 at 2.) If each word is given a separate meaning, then it follows that an extension or a renewal of the indebtedness is different from a modification. This suggests that "modification" was not intended to include broad, fundamental changes to the indebtedness. Otherwise, the words "extension" and "renewal" would be surplusage, because their meaning would be encompassed within the sweeping definition of "modification."

Similarly, Paragraph One of the Guaranty uses "modification" in a list of other terms. It authorizes Crossville to make "extensions, renewals, sales, pledges, surrenders, compromises, settlements, releases, indulgences, alterations, substitutions, exchanges, amendments, modifications or other dispositions, of all or any part of the Indebtedness . . . ." (Docket No. 1, Exs. 3-5 at 2 ¶ 1.) Again, reading this list to avoid surplusage indicates that the parties intended to give "modification" a narrow definition.

In light of the dictionary definition of "modification," Paragraph Seven's limiting provisions, and the language surrounding "modification" in the Guaranty, the court concludes that the term "modification" is ambiguous with regard to its application to the Second Note. At the very least, the term does not unambiguously cover major increases in Kemper's outstanding

debt. Consequently, at this stage, Crossville is not entitled to judgment as a matter of law. The parties will be free to present parol evidence at the summary judgment stage.

## **CONCLUSION**

For the reasons discussed above, the court will deny Crossville's Motion for Judgment on the Pleadings.

It is so Ordered.

Entered this 2nd day of July 2010.

_____
ALETA A. TRAUGER
United States District Judge