**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION**

| | | |
|---|---|---|
| **CROSSVILLE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:09-cv-0120** |
| | ) | **Judge Trauger** |
| **KEMPER DESIGN CENTER, INC.,** | ) | |
| **JEROME H. BERKEMEYER,** | ) | |
| **JIM BERKEMEYER, and EDWARD SPAR,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM**</u>

Pending before the court is the Motion for Summary Judgment filed by defendants Kemper Design Center, Inc., Jerome Berkemeyer, Jim Berkemeyer, and Edward Spar (Docket No. 15), to which the plaintiff has filed a response (Docket No. 20), and in support of which the defendants have filed a reply (Docket No. 21). For the reasons discussed below, the defendants' motion will be granted in part and denied in part.

<u>**FACTS**</u>

Defendant Kemper Design Center, Inc. ("Kemper") is a defunct company that sold ceramic tile, stone, and granite countertops and served as a dealer for products manufactured by plaintiff Crossville, Inc. ("Crossville").[1] In 2007, Crossville nearly terminated the distributor

---

[1] Unless otherwise noted, the facts are drawn from the defendants' statements of facts (Docket No. 17), the plaintiff's response thereto (Docket No. 19), and related exhibits. The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

relationship with Kemper, but the parties worked out a deal allowing Kemper to continue to sell the products. By February 2008, Kemper owed Crossville a significant amount of money for products purchased on credit after October 2007.

On February 29, 2008, Kemper signed a promissory note to Crossville for $239,479.29 (the "First Note"), to be paid in 12 monthly installments of $19,956.60, plus interest.[2] These payments were due on the first of each month, beginning in April 2008. The note provided that interest of 1% over prime "shall be calculated . . . on the unpaid principal balance as of the last day of each month." (Docket No. 1, Ex. 1 at 2.)

The note was secured by personal guaranties, also signed on February 29, 2008, from the three shareholders of Kemper: defendants Jerome Berkemeyer, Jim Berkemeyer, and Edward Spar (collectively, "the Guarantors" or the "individual defendants"). The guaranty agreements stated, in relevant part: "This Guaranty shall be continuing, absolute and unconditional, and shall apply to and cover all renewals, extensions and modifications of the Indebtedness."[3] (*Id.*, Exs. 3-

---

[2] The twelfth and final payment, to be paid on March 1, 2009, was to include an extra nine cents of principal.

[3] The Guarantors signed separate but essentially identical guaranty agreements (*see* Docket No. 1, Exs. 3-5), which the court will collectively refer to as the "Guaranty." The Guaranty defines "Indebtedness" as:

> (a) All indebtedness and obligations now or hereafter evidenced by or owing pursuant to the Promissory Note dated February 29, 2008, in the original principal amount of $239,479.29 executed by [Kemper] to [Crossville], whether principal, interest, or otherwise.
>
> (b) All indebtedness and obligations of Debtor now or hereafter evidenced by or owing pursuant to any and all other instruments and documents now or hereafter

5 at 2.)  Affidavits from Spar and the Berkemeyers state that they "signed the guaranty with the intention of guaranteeing payment of $239,479.29 due on the Note."  (Docket No. 16, Ex. 1 ¶ 8; *id.*, Ex. 2 ¶ 3; *id.*, Ex. 3 ¶ 3.)  "[They] did not agree to guarantee payment of any other amounts due and owing to Crossville at that time or some future date."  (*Id.*)

The Guaranty further provided:

> The granting of credit from time to time by [Crossville] to [Kemper], in excess of any amount to which right of recovery under this Guaranty is limited and without notice to the undersigned, is hereby expressly authorized and shall in no way affect or impair this Guaranty.  In the event that the Indebtedness of [Kemper] to [Crossville] shall so exceed any amount to which this Guaranty is limited, if any, any payments by [Kemper] . . . may first be applied by [Crossville] to any portion of the Indebtedness which exceed the limits of this Guaranty.

(*Id.* at 3.)

It is undisputed that, between April and December 2008, Kemper sent nine checks to Crossville, as required by the terms of the First Note.  Each of these checks indicated that it was in payment of the "Crossville loan"; some checks included more specific notations, such as

---

> evidencing or securing the indebtedness and obligations owing by [Kemper] to [Crossville] pursuant to the above Promissory Note.

> (c)      The full and prompt payment of all costs and expenses of whatever kind and nature incident to collection of the indebtedness evidenced by any of the foregoing, the enforcement or protection of any rights of Lender thereunder, and the exercise by [Crossville] of any rights and remedies thereunder, including but not limited to the payment of reasonable attorneys' fees.

(Docket No. 1, Exs. 3-5 at 2.)

"Payment #1 – Note" and "Payment #2 of 12." (*Id.*, Ex. 4 at 6-15.) Each of the checks, except for the first, itemized the amount of principal being paid (in each case, $19,956.60) and the amount of interest being paid (interest exceeded $1,000 for the earlier checks and fell to approximately $330 for the ninth check). (*Id.*)

Kemper continued to purchase products from Crossville on credit, but it began falling behind on those payments. At the end of 2008, Kemper entered into discussions with Jim Smith, Crossville's credit manager, regarding the execution of a new promissory note. Defendant Spar's affidavit states that the parties intended that this note "would include the remaining two payments from the first note, plus an additional $114,474.58 for products purchased and shipped in April 2008 to November 2008." (*Id.*, Ex. 1 ¶ 10.) The defendants have submitted an email to Kemper from Smith, dated December 18, 2008, that stated:

> I am pleased to advise [that Crossville] will revise the existing note and add your present account balance outstanding of $114,533.43. Adding this to your outstanding balance on the existing note of $59,869.89 will make the new note a total of $174,403.32.
>
> This is to be repaid at principal payments of $19,956.60 plus interest at Prime plus 1% beginning January 1, 2009 until paid in full[.]
>
> I should have the new notes for Jerry [Berkemeyer], Jim [Berkemeyer] and Ed [Spar] to sign by Monday and will send them to you ASAP[.][4]
>
> Also, in doing this, if you would happen to have any additional orders they would be on a COD basis[.]

---

[4] In his affidavit, Smith states that, although he wrote "the new notes for Jerry, Jim and Ed to sign," he actually meant new personal guaranties, not notes. (Docket No. 19, Ex. 1 ¶ 51.)

> When you do the January payment, just calculate the interest on
> the present balance of $59,869.89 and then start the interest on the
> new balance for the February payment.

(*Id.*, Ex. 4 at 16.)

Kemper executed a new promissory note (the "Second Note") on December 31, 2008, in the amount of $174,403.32. The note provided that it "replaces and modifies that certain Promissory Note of Kemper to Crossville, dated February 29, 2008, in the original principal amount of $239,479.29." (Docket No. 1, Ex. 2 at 4.) Jerome Berkemeyer signed the note on behalf of Kemper. The Second Note obligated Kemper to make monthly payments of $19,956.60 plus interest, with a final payment of $14,750.52 due on September 1, 2009. (*Id.* at 2.) Kemper sent Crossville a check dated December 31, 2008 for $20,175.71, which included $19,956.60 of principal. (Docket No. 16, Ex. 4 at 15.)

It is undisputed that Crossville requested that Spar and the Berkemeyers sign new guaranties contemporaneously with the Second Note. A December 22, 2009 email from Jim Smith to Kemper attached the blank Second Note form "along with the three Personal Guaranties." (*Id.*, Ex. 1 at 11; *see also id.* at 8 (unexecuted guaranty form for Edward Spar); Docket No. 19, Ex. 1 ¶ 50 (affidavit of Smith stating that, "[d]ue to Kemper's financial position, Crossville would not have agreed and did not agree to revise, modify or extend the February 29, 2008 Promissory Note in any way without the owners' personal guaranties.").))

The individual defendants never signed the second set of guaranties, however. A February 9, 2009 email from Smith stated that he "really need[ed] the signed copies of the personal guarantees from the three guys ASAP !!!!" (Docket No. 16, Ex. 1 at 14.) On February

23, 2009, Smith sent an email requesting that "the personal guarantees from Jerry, Jim and Ed" be sent "to [his] attention ASAP." (*Id.* at 15.) On February 27, 2009, Smith again wrote that he "really need[ed] an update ASAP and the original copies of the documentation" because "[Crossville had] auditors and they [were] breathing down [his] neck." (*Id.* at 17.)

In a response emailed to Smith on February 27, 2009, defendant Spar wrote that, because of Kemper's deteriorating economic condition, "the owners are not in a position to sign additional person[al] guarantees for the new note." (*Id.* at 22.) Responding via email that same day, Smith wrote:

> When we renewed the note to assist Kemper it was with the complete understanding that all three of you would sign the personal guarantees. This was never questioned and us renewing the note was definitely predicated on all three of you signing off on it just as you had before.

(*Id.* at 23.)

Because of the company's cash flow problems, after December 31, 2008, Kemper failed to make any additional monthly payments on the Second Note.[5] On March 6, 2009, Crossville mailed Kemper a notice of default and acceleration. (Docket No. 1, Ex. 6.) On October 28, 2009, Smith sent the individual defendants a demand letter stating that $151,499.95 of outstanding principal and $3,094.97 of interest was due on the Second Note. (Docket No. 16, Ex. 4 at 21.)

Crossville subsequently filed suit in this court, seeking payment on the Second Note from

---

[5] In June 2009, however, $2,947.27 of a payment on product invoices was applied to the Second Note's principal balance. (Docket No. 16, Ex. 4 at 17.)

Kemper, Spar, and the Berkemeyers. Crossville has asserted claims for breach of contract and unjust enrichment. It previously filed a Motion for Judgment on the Pleadings, arguing that, as guarantors, the individual defendants were liable for the entire balance of the Second Note. In response, the defendants argued that the increase in principal embodied by the Second Note was not a "modification" of the First Note to which the Guaranty applied. In denying the plaintiff's motion, the court held that, at a minimum, the term "modification" as used in the Guaranty "does not unambiguously cover major increases in Kemper's outstanding debt." (Docket No. 12 at 10-11.) The court noted that the parties were free to introduce parol evidence regarding the meaning of the term at the summary judgment stage. (*Id.* at 11.)

## ANALYSIS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     Principal Balance Before the Execution of the Second Note

As an initial matter, the parties dispute whether the Second Note is properly characterized as adding principal to the outstanding balance of the First Note. During 2008, Kemper made monthly payments on the First Note and, at the same time, continued to order products from Crossville on credit. In addition to the note payments, Kemper made a number of separate payments to Crossville to pay down this line of credit. (*See* Docket No. 19, Ex. 1 ¶¶ 13-49 (recounting payments made by Kemper in 2008).)

The defendants argue that, when the parties executed the Second Note in December 2008, there was $59,869.89 of outstanding principal on the First Note. (Docket No. 16 at 4.) They claim that the Second Note added approximately $115,000 of principal to this outstanding balance, which reflected the amount due on invoices for products ordered after February 2008. This view is supported by the December 18, 2008 email from Crossville's credit manager, Jim Smith, which stated:

> I am pleased to advise [that Crossville] will revise the existing note
> and add your present account balance outstanding of $114,533.43.

> Adding this to your outstanding balance on the existing note of
> $59,869.89 will make the new note a total of $174,403.32. . . .
> When you do the January payment, just calculate the interest on
> the present balance of $59,869.89 . . . .

(Docket No. 16, Ex. 4 at 16.)

Although Crossville concedes the authenticity of that email, it argues that it has

retroactively decided to apply the monthly note payments to Kemper's line of credit. (Docket

No. 20 at 8-9.) The plaintiff has submitted an affidavit from Jim Smith indicating that, in light of

the way Crossville has now decided to allocate the payments, the principal balance of the First

Note in December 2008 was at least $177,355.08. (*See* Docket No. 19, Ex. 1 ¶¶ 48-49.) Smith

states that the Second Note modified the First Note by *reducing* the principal balance to

$174,403.32 and extending the maturity date from March 1, 2009 to September 1, 2009. (*Id.* ¶

50.)

In his affidavit, Smith acknowledges that this is inconsistent with his December 18 email,

which explicitly stated that the balance of the First Note was $59,869.89:

> In the email I . . . referenced a balance due under the February 29,
> 2008 promissory note and a balance due on outstanding invoices . .
> . . These amounts are no longer accurate because Crossville
> exercised its contractual right to apply Kemper's payments prior to
> the date of the email and thereafter first to Kemper's Indebtedness
> to Crossville for materials supplied by Crossville to Kemper on
> credit account, which Indebtedness exceeded the Indebtedness
> secured by the February 29, 2008 Promissory Note, and then to the
> Indebtedness secured by the February 29, 2008 Promissory Note.

(*Id.* ¶ 51.) Ultimately, Crossville claims that the defendants are liable for $158,700.12 of unpaid

principal from the First Note. (Docket No. 20 at 8-9.)

The plaintiff argues that the notes and the Guaranty allow it to retroactively change the

application of Kemper's payments. (Docket No. 20 at 9 ("[A]ll of those statements were made prior to Crossville exercising its right to apply Kemper's payments first to Kemper's Indebtedness to Crossville for materials supplied . . . on credit account, . . . and then to the Indebtedness secured by the February 29, 2008 Promissory Note.").) But the plaintiff does not explain why it is allowed to retroactively change the application of the payments, and it does not cite any case law in support of its position.

The Guaranty provided that, "[i]n the event that the Indebtedness of [Kemper] to [Crossville] shall so exceed any amount to which this Guaranty is limited, if any, any payments by [Kemper] . . . may first be applied by [Crossville] to any portion of the Indebtedness which exceeds the limits of this Guaranty." (*Id.*, Ex. 3 at 2.) This clause arguably allowed Crossville to apply any given payment from Kemper to the line of credit before applying it to the balance of the First Note.[6] The clause does not, however, allow Crossville to apply payments to the note balance and then, months or years after the fact, reallocate the payments, retroactively increasing

---

[6] Of course, Kemper itself was not a party to the guaranty agreements, and the plaintiff does not address whether any terms of the First Note allowed Crossville to apply the payments as it desired. The monthly payments were clearly designated by Kemper as payments on the First Note.

The most relevant clause from the First Note states that, "[u]nless Crossville elects otherwise, all payments . . . shall be applied first to the payment of interest as herein provided, then to amounts of principal." (Docket No. 1, Ex. 1 at 2.) This speaks to the allocation of payments between interest and principal, but it is ambiguous whether it allows Crossville to elect to apply payments to Kemper's separate and unrelated debts. None of the First Note's other terms contemplate that Crossville might apply Kemper's monthly payments to separate debts.

Regardless, for the purposes of this Memorandum, the court will assume that, upon receipt of the payments, Crossville had the initial right to apply them as it desired.

the outstanding note balance.

It is a longstanding rule in Tennessee that, once a creditor has applied a payment to a particular debt, it may not unilaterally change the application of that payment, particularly to the detriment of a guarantor.[7] *Weaver v. Ogle*, 2 Tenn. App. 563, 579 (Tenn. Ct. App. 1926); *First National Bank v. Bovay*, 13 Tenn. App. 689, 698 (Tenn. Ct. App. 1931); *Harding v. Wormley, Pritchett & Co.*, 67 Tenn. 578, 579 (Tenn. 1876) ("[I]t is argued that the creditor and debtor may agree to change the credit and place it upon another debt. As between themselves they might, but in this case the creditor, having . . . entered the credit, the payment of the note to that extent was complete, and this part of the debt could not afterward be revived against the endorsers without their consent.").[8] As the court stated in *Weaver*:

> The general rule in this state in respect to the appropriation of payments is that a debtor owing different debts to the same person has a right to apply the payments at a time when made to either debt and if he fails to do so and the payment be general, the creditor may apply it. . . . The law is further, however, that when either party has made or directed an application of a payment such application cannot thereafter be changed without the consent of both the payor and the payee, especially to the detriment of a third party.

*Weaver*, 2 Tenn. App. at 578, *quoted in First Nat'l*, 13 Tenn. App. at 698; *see also* 20 Tenn. Jur.

---

[7] The Guaranty and the notes provide that they are governed by Tennessee law.

[8] Although these precedents are quite old, it appears that they are still good law. Both *Weaver* and *Harding* were approvingly cited by Tennessee courts as recently as 1986. *First Tenn. Prod. Credit Assoc. v. Davis*, 1986 Tenn. App. LEXIS 3044, at *8-9 (Tenn. Ct. App. June 3, 1986) (citing the cases for the rule that, if a debtor does not specify how a payment is to be applied, the creditor may decide how to allocate the payment among multiple debts), *rev'd on other grounds*, 748 S.W.2d 83 (Tenn. 1988). The court's research has not found any more recent Tennessee cases to the contrary.

*Payment* § 14 (2010) ("The creditor and the debtor may agree to change an application of payment as between themselves, but there can be no change without the consent of both the payor and the payee, especially to the detriment of a third party, and of all interested parties." (footnotes omitted)).  An application of a payment occurs when the creditor performs "some act showing an intention to specifically appropriate the payment to a particular debt."  *Weaver*, 2 Tenn. App. at 579.  "[I]t may be evidenced by circumstances as well as by express declarations," including "a statement given the debtor by the creditor."  *Id.*

This accords with the rule in other jurisdictions.  *See, e.g.*, *Federal Land Bank v. Wilson*, 719 F.2d 1367, 1371 (8th Cir. 1983) ("Where an application of payment has been made and the debtor notified, the debt is discharged.  Only assent of the parties can justify reapplication after the creditor has applied the payment and notified the debtor."); *Industrial Inv. Corp. v. Rocca*, 596 P.2d 100, 104 (Idaho 1979) ("[O]nce a creditor has applied a payment to an obligation for which a guarantor is bound, the guarantor is discharged to the extent of the payment and the creditor may not thereafter alter or modify such application."); *Reserve Ins. Co. v. Gayle*, 393 F.2d 585, 589 (4th Cir. 1968) (noting the "established principle that once a creditor has applied a payment to an obligation for which a surety or guarantor is bound, the latter is discharged to the extent of the payment, and the creditor may not thereafter alter or modify such application"); *Olson Constr. Co. v. United States*, 332 F.2d 981, 984 (10th Cir. 1964) ("[A] payment once made and applied cannot be recalled or otherwise applied without the consent of the surety . . . ."); *see also* 60 Am. Jur. 2d *Payment* § 67 (2010) ("[A] creditor who applies a payment in a particular way is bound by this act and cannot afterward change the application without the

debtor's consent, at least where such application has been communicated to the debtor. . . . Once a payment has been applied to an obligation for which a surety or guarantor is bound, such surety or guarantor is discharged to the extent of the payment, unless they agree to the change." (footnotes omitted)); 70 C.J.S. *Payment* § 58 (2010) ("After the creditor has made an application of a payment and has notified the debtor, it may not be altered except by mutual consent." (footnotes omitted)).

Here, the undisputed evidence shows that, at the time Crossville received Kemper's monthly payments, it applied them to the balance of the First Note. Smith's email to Kemper plainly stated that, as of December 18, 2008, the balance of the First Note was $59,869.89.[9] Neither Kemper nor the individual defendants ever consented to a reapplication of those payments. Thus, the court finds that the outstanding balance on the First Note was $59,869.89 at the time the Second Note was executed and that the Second Note incorporated, and added $114,533.43 of principal to, that amount.

## III.    Applicability of the Guaranties to the Second Note

By their terms, the defendants' guaranties apply to "all renewals, extensions and modifications" of the First Note. The plaintiff argues that the individual defendants are liable for the full amount of the Second Note because that note was a "modification" of the First Note. (Docket No. 20 at 10-23.)

---

[9] Furthermore, Kemper's monthly payments included interest, which was calculated on the outstanding principal. The interest portion of Kemper's payments steadily fell from approximately $1,300 in Kemper's first payment to approximately $330 in its ninth payment. (Docket No. 16, Ex. 4 at 6, 14). This reflects a steadily falling principal balance.

Under Tennessee law, the interpretation of written documents, like the documents at issue in this case, is a matter of law appropriate for the court to decide. *See, e.g.*, *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). "A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Id.* (citing *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005)). The starting point for ascertaining the intent of the parties is to examine the plain meaning of the words to determine whether the language is ambiguous. *Id.* (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002)). Generally, language in a contract is ambiguous when it is "susceptible to more than one reasonable interpretation." *Id.* A commercial guarantor, however, "shall be held to the full extent of his engagements," and "the rule in construing [guaranties] is that the words of the guaranty are to be taken as strongly against the guarantor as the sense will admit.'" *Samick Music Corp. v. Hoy*, No. M2008-00441-COA-R3-CV, 2008 Tenn. App. LEXIS 639, at *7 (Tenn. Ct. App. Oct. 22, 2008) (quoting *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)).

This court previously held that, even construing the Guaranty against the individual defendants, the term "modification" is ambiguous, in that it does not unambiguously cover a threefold increase in outstanding principal.[10] (Docket No. 12 at 7-11.) In support of this finding,

---

[10] As explained in the court's previous Memorandum, the fact that the Second Note characterizes itself as a "modification" of the First Note is not dispositive of the issue. "The court must examine the Guaranty to ascertain the meaning of 'modification' as it is used within that agreement. It is the intent of the parties to the Guaranty, not the intent of the parties to the Second Note, that the court must determine." (Docket No. 12 at 7 n.9.)

The plaintiff calls this statement "completely unsupported by law or logical analysis" and states that the court should have "(1) determine[d] what 'modifications' the parties intended the

the court primarily cited and discussed *MCI Telecommunications Corp. v. AT&T Co.*, 512 U.S. 218 (1994), *superseded by statute on other grounds*, Telecommunications Act of 1996, 47 U.S.C. § 160(a)(1), *as recognized in Boomer v. AT&T Corp.*, 309 F.3d 404, 408-09 (7th Cir. 2002). (Docket No. 12 at 7-8.) The court also examined other provisions in the Guaranty to provide context for the term "modification." (*Id.* at 9-10.)

In *MCI*, the Supreme Court analyzed a federal statute that authorized the FCC to "modify" certain requirements binding on telecommunication companies. *Id.* at 224. The Court stated that "[t]he word 'modify' – like a number of other English words employing the root 'mod-' . . . , such as 'moderate,' 'modulate,' 'modest,' and 'modicum,' – has a connotation of increment or limitation." *Id.* at 225. "Virtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion." *Id.* Thus, the Court concluded that the "small-scale world of 'modifications'" does not include "fundamental changes." *Id.* at 228-29; *see also Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1037 (6th Cir. 1995) ("[T]he word 'modification' 'connotes moderate change.'" (quoting *MCI*, 512 U.S. at 225)). Applying this conclusion, this court held that, because adding more than $100,000 of principal to the outstanding balance of the First Note was not a moderate, limited change, "modification" did not unambiguously encompass such an addition.

If a contract is ambiguous, the court may consider parol evidence, including the

_____

Guaranty to cover; and (2) determine[d] whether the parties intended the so-called Second Note to be a 'modification' covered by the Guaranty." (Docket No. 20 at 12.) But the Guarantors were not parties to the Second Note, which was executed by Kemper. Furthermore, the court *is* determining what "modifications" the parties intended the Guaranty to cover and whether the parties intended that term to encompass a relatively large addition of principal.

15

contracting parties' statements and conduct, to "guide the court in construing and enforcing the contract." *Allstate*, 195 S.W.3d at 612 (citing *Memphis Housing Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001)). Here, the evidence submitted by the parties shows that they did not intend the Guaranty to apply to large-scale increases in outstanding principal.

First, the affidavits from the individual defendants state that they only intended to guarantee $239,479.29 of principal, the amount of the First Note. Second, and more important, the parties' conduct during the negotiation and execution of the Second Note indicates that nobody expected the initial guaranties to apply to the newly added principal. Crossville sent new guaranty agreements for Spar and the Berkemeyers to sign that explicitly guaranteed the full amount of the Second Note. It is undisputed that Crossville expected and desired the defendants to sign the new guaranties. For example, Smith's February 27, 2009 email to defendant Spar stated: "When [Crossville] renewed the note to assist Kemper it was with the complete understanding that all three of you would sign the personal guarantees." (Docket No. 16, Ex. 1 at 23.) Crossville's persistent and increasingly frantic attempts to have the defendants execute the new guaranties illustrate the importance of the guaranties to Crossville. The obvious implication is that the original guaranties were not intended to serve as guaranties of the full amount of the Second Note. If they were, new guaranty agreements would have been unnecessary.[11]

---

[11] In his affidavit, Smith states that, in a March 3, 2009 telephone discussion with defendant Spar, Smith "advised Mr. Spar that the original personal guaranties applied to and covered all . . . modifications of the indebtedness secured by the [First Note,] including the December 31, 2008 modification." (Docket No. 19, Ex. 1 ¶ 52.) Smith states that "Ed Spar did not dispute [his] statement and responded only that they just were not able to pay any note

In light of this evidence, the court finds that the February 29, 2008 guaranties were not intended to apply to so-called "modifications" of the First Note that add a relatively large amount of new principal to the outstanding balance. The Second Note added approximately $115,000 of principal to an outstanding balance of approximately $60,000. Besides nearly tripling the outstanding balance, the new principal was almost half of the original note amount. This was a fundamental change to the First Note, not a mere "modification," and the individual defendants are not liable as guarantors for the $115,000 of additional principal.[12]

The plaintiff devotes most of its brief to an attempt to revisit this court's decision that the term "modification" is ambiguous, a reading that the plaintiff criticizes as "strained." (Docket No. 20 at 14.) According to the plaintiff, the Second Note is unambiguously a "modification" of the First Note, and the defendants are liable for the entire unpaid balance on the Second Note.

The plaintiff argues that *MCI* is irrelevant because, in that case, the Supreme Court was analyzing a statute, not a promissory note. (*Id.*) But the plaintiff does not argue or explain why the dictionary definitions discussed in *MCI* are inapplicable here. The dictionary definition (and thus the plain meaning) of a word does not change depending on whether the word is used in a statute or in a contract. Notably, the plaintiff's brief does not discuss the dictionary definition of "modification."

---

payments at that time." (*Id.*)
　　Obviously, this conversation occurred after the defendants had already refused to sign the new guaranties. No evidence indicates that, before that refusal, Crossville believed and intended that the original guaranties applied to the additional principal.

[12] The defendants concede that Kemper itself is liable for the entire unpaid balance of the Second Note. (Docket No. 16 at 11.)

Instead, the plaintiff cites a number of cases, only one of which is firmly on point, in which courts or parties have used the word "modification" to refer to a change to a promissory note. The most relevant case discussed by the plaintiff is *Donell v. Perpetual Investment, Inc.*, No. 2:04-CV-01172, 2006 U.S. Dist. LEXIS 71741 (D. Nev. Sept. 25, 2006). In *Donell*, the defendant company executed a promissory note for $1,517,000, and the company's owner, defendant Robert Rippe, signed the note both on behalf of the company and as personal guarantor. *Id.* at *1. Six months later, the company signed a "renewal, extension and/or modification agreement" that increased the principal amount to $1,692,000. *Id.* at *2. Rippe again signed on behalf of the company but did not sign as guarantor. *Id.* The full amount of the principal was due on the note's maturity date, and the company ultimately failed to make that payment. *Id.*

The Nevada district court, applying Nevada law, held that, because the modification "[did] not change the terms of the original note" and provided that all previous terms and conditions "shall remain in full force and effect," the modified note "constitute[d] a clear and unambiguous adoption by reference of all previous terms and conditions, including the guaranty." *Id.* at *4-5. Thus, Rippe was still liable as guarantor. *Id.* at *5. The court further stated:

> Even assuming the Court is not correct in its legal conclusion that the contract language is clear and unambiguous, Plaintiff has not introduced any evidence in support of his affirmative defense of discharge to establish that it was intended by the parties that RIPPE's guaranty would be eliminated pursuant to the modification. Accordingly, RIPPE would still be liable as a guarantor for, at minimum, the amount of the original note.

*Id.*

Donell is distinguishable from the instant case in several key respects. First, in *Donell*, the increase of principal was $175,000, which constituted only approximately 12% of the outstanding balance of $1,517,000. This relatively minor increase is much smaller than the nearly 200% increase at issue in this case. Second, the guarantor in *Donell* apparently signed the note itself. The court was not interpreting the language of a separate guaranty agreement, and the case did not directly address the meaning of "modification." Third, as the *Donell* court noted, there was no evidence that the parties did not intend the guarantor to assume liability for the increased amount. Here, there is such evidence.

The other cases cited by the plaintiff are inapposite. In *Beal Bank, S.S.B. v. RBM Co.*, No. 03A01-9902-CH-00041, 1999 Tenn. App. LEXIS 790 (Tenn. Ct. App. Nov. 30, 1999), the court, applying Georgia law, *id.* at *10, found that certain notes executed after the defendant company entered bankruptcy were "modifications" of previous notes, *id.* at *16. The new notes (1) provided for the accrual of interest on previously accrued interest and attorney's fees, (2) lowered the interest rates of the previous notes, and (3) allowed prepayment of the debt without penalty. *Id.* at *16, 20. Critically, however, *Beal Bank* did not involve any addition of unrelated principal, much less a large increase of principal. The case does not support the proposition that such a fundamental change is a "modification" for which a guarantor can be held liable.

Similarly, several of the other cases cited by the plaintiff involve "modifications" other than increases of principal. These cases discuss changes to notes' terms that, although material,

19

are not analogous to tripling the outstanding principal of the note.[13]  *Cicardo v. Van Der Molen*, No. 08-cv-606, 2009 U.S. Dist. LEXIS 23064, at *17-18 (W.D. Wis. Mar. 19, 2009) (finding that an extension of maturity date, a reduction in interest rate, and an addition of a provision regarding acceleration of the note were modifications that did not discharge a guarantor's obligation); *Mercer v. Bank of Currituck (In re Mercer)*, No. 09-04088-8, 2010 Bankr. LEXIS 2446, at *3 (Bankr. E.D.N.C. July 23, 2010) (stating that a note was "modified . . . to extend the term of the note").  None of these cases analyzes the definition of "modification" or discusses whether fundamental changes to the debtor's obligations constitute modifications that are binding on a guarantor.

In the plaintiff's remaining cases, the modifications at issue did increase principal, but, when the principal was added, the guarantors agreed to guarantee the new amount.  *Wachovia Bank, N.A. v. Anderson*, No. 3:09CV630, 2010 U.S. Dist. LEXIS 48786, at *2 (E.D. Va. May 18, 2010) (the principal on a note was increased from $14.6 million to $15.9 million, but the guarantors agreed to guarantee the increased amount); *FDIC v. Bristol Home Mortg. Lending, LLC*, No. 08-81536-CIV, 2009 U.S. Dist. LEXIS 74683, at *2 (S.D. Fla. Aug. 13, 2009) (when a promissory note for a $1 million line of credit was increased to $1.95 million, the defendant "unconditionally guaranteed payment of the modified note"); *Sovereign Bank v. JARD Mktg. Corp.*, No. 08-4483-A, 2009 Mass. Super. LEXIS 103, at *2 (Mass. Super. Ct. Apr. 23, 2009)

---

[13] One case cited by the plaintiff involved a modification to a deed of trust, in which approximately six acres of land were added to an existing deed granting 75 acres.  *In re McCarter*, 296 B.R. 750, 752 (Bankr. E.D. Tenn. 2003).  But that case centered on proper appraisal values, not on the definition of "modification," and, in any event, the addition at issue was an increase of less than 10%.

(the guarantors themselves executed a "Note Modification Agreement" "by which they personally guarantied the [increased] principal amount"); *Hous. Dev. Fund, Inc. v. 130 Main St. Dev., LLC*, No. FSTCV085007937S, 2009 Conn. Super. LEXIS 881, at *1-2 (Conn. Super. Ct. Mar. 26, 2009) (principal on a $4,925,000 promissory note was increased by approximately 5%, and "the parties," apparently including the initial guarantors, approved the increase); *Nat'l City Bank v. Rini*, 834 N.E.2d 836, 837 (Ohio Ct. App. 2005) (the principal on a note was increased from $200,000 to $300,000, and the defendant signed a guaranty for $300,000). Again, these cases do not address the argument that a fundamental change to a note is not a "modification," and they do not discuss the definition of "modification."

In sum, none of the cases cited by Crossville supports its contention that "modification," as used in the Guaranty, unambiguously covers the significant amount of principal added by the Second Note. In light of the parol evidence submitted by the defendants, the court finds that the individual defendants are not liable as guarantors for repayment of that $114,533.43 of principal.

## IV.     Amount of the Defendants' Liability as Guarantors

The individual defendants further argue that they are not liable as guarantors for any part of the Second Note. (Docket No. 16 at 10.) The court finds, however, that they are still liable for the portion of the Second Note representing Kemper's indebtedness from the First Note.

As discussed above, $59,869.89 of principal from the First Note was incorporated into the Second Note, which, by its terms, "replace[d]" the First Note. (Docket No. 1, Ex. 2 at 4.) The Guaranty provided that the defendants guaranteed "[a]ll indebtedness . . . of [Kemper] now or hereafter . . . owing pursuant to any and all other instruments . . . now or hereafter evidencing

or securing the indebtedness and obligations owing by [Kemper] to [Crossville] pursuant to the [First Note]."  (Docket No. 1, Ex. 3 at 2.)  The $59,869.89 of outstanding principal from the First Note that Kemper rolled over into the Second Note is ultimately "indebtedness . . . owing . . . pursuant to" the First Note, so the individual defendants' guaranties continue to apply to that debt.

The undisputed evidence shows that, in December 2008 and June 2009, Crossville applied payments of $19,956.60 and $2,947.27, respectively, to the principal balance of the Second Note.[14]  (Docket No. 16, Ex. 4 at 15, 17.)  This totals $22,903.87 of payments.[15]  But the evidence submitted by the parties does not indicate whether the parties intended the payments to apply to the $114,533.43 of principal added to the Second Note, to the $59,869.89 rolled over from the First Note, or proportionately to both.  Rather, with regard to the application of payments, the parties treated the Second Note as a singular debt and did not distinguish between the two amounts.

Thus, the court must decide how to apportion the payments.  *Mason v. Smith & Harris*, 79 Tenn. 67, 74 (Tenn. 1883) ("[T]here was no application of the payment by any of the parties. The application must therefore be made by the law."); Restatement (Second) of Contracts § 260(1) (1981) ("If neither the debtor nor the creditor has exercised his power with respect to the

---

[14] For the reasons discussed earlier in this Memorandum, the plaintiff cannot now reallocate those payments to different debts.

[15] This figure is confirmed by the October 28, 2009 demand letter that Crossville sent to Kemper, which stated that the outstanding principal balance on the Second Note was $151,499.45.  (Docket No. 16, Ex. 4 at 21.)  Subtracting that amount from the initial note balance of $174,403.32 leaves $22,903.87.

application of a payment . . . , the payment is applied to debts to which the creditor could have applied it with just regard to the interests of third persons, the debtor and the creditor."), *quoted in Alside Supply Ctr. v. Vinson*, 802 S.W.2d 632, 635 (Tenn. Ct. App. 1990); *see also* 20 Tenn. Jur. *Payment* § 13 ("The court makes the application of the payments when the parties do not. . . . The court will apply a payment as justice and equity may dictate at the time the court acts." (footnote omitted)). "It has long been the rule in [Tennessee] that a court of equity may allocate . . . payments for the purposes of achieving equity and a result consonant with good conscience." *Hayes Pipe Supply, Inc. v. McKendree Manor, Inc.*, 695 S.W.2d 174, 178 (Tenn. 1985).

The Restatement provides that, in allocating a debtor's payments, the court should give preference "to an unsecured or precarious debt rather than one that is secured or certain of payment." Restatement (Second) of Contracts § 260(2)(b)(ii). But in *Blackmore v. Granbery*, 39 S.W. 229 (Tenn. 1896), the Tennessee Supreme Court rejected this approach. Rather than following the common law rule of giving preference to "the most precarious debt," the court adopted the civil law rule, which states that a court should apply payments "to discharge debts for which a surety is bound, rather than to one where the debtor has given no surety." *Id.* at 230. Alternately phrased, "application ought to be made to the debt for which the debtor has given securities, rather than to those he owes singly." *Id.* at 230-31 (quotation marks omitted); *see also* 20 Tenn. Jur. *Payment* § 13 ("Payments will be applied to discharge debts for which a surety is bound, rather than to one where the debtor has given no surety.") The Tennessee Supreme Court subsequently recognized this rule in *Southern Construction Co. v. Halliburton*, 258 S.W. 409,

414-15 (Tenn. 1923).[16]  This court's research has not revealed any later Tennessee cases

repudiating the rule laid out in *Blackmore*.

Accordingly, the court will apply all of Kemper's payments to the portion of the Second

Note secured by the individual defendants' guaranties.  As a result, the individual defendants are

liable as guarantors for $36,966.02 of the principal balance of the Second Note, plus contractual

interest and fees.[17]

## V.     Attorney's Fees and Interest

The plaintiff seeks to recover its attorney's fees and 18% prejudgment interest on the

amounts owed by the defendants.  (Docket No. 1 ¶ 27.)  Both the First Note and the Second Note

provide that, "[i]n case of litigation to collect this note . . ., Kemper shall pay all costs incident to

collection, including reasonable attorney's fees actually incurred."  (Docket No. 1, Ex. 2 at 2.)

Both notes also provide that, upon acceleration due to default, interest shall accrue at 18%.  (*Id.*

at 2-3.)  The Guaranty specifically allows Crossville to recover reasonable attorney's fees

pursuant to "collection of the indebtedness."  (Docket No. 1, Ex. 3 at 1.)

The defendants argue that the court should equitably reduce the attorney's fees and

interest recoverable from Kemper itself because Kemper has admitted that it owed $151,499.45

---

[16] In *Southern Construction*, the court declined to extend the *Blackmore* rule to a
contractor's debts secured by statutorily required surety bonds.  258 S.W. at 414.  The court
reasoned that the rule was intended to apply to personal sureties, not statutorily mandated,
compensated sureties.  *Id.* at 415.  Here, the guaranties by the individual defendants are personal
sureties.

[17] $59,869.89 minus $22,903.87 equals $36,966.02.

on the Second Note, making litigation against the company unnecessary.[18]  (Docket No. 16 at 11-12; *see also* Docket No. 5 ¶¶ 18, 20 (Answer admitting that Kemper defaulted on the Second Note and owes "certain monies" to the plaintiff).)  The court agrees that a reduction in attorney's fees against Kemper is proper, because nearly all of the plaintiff's efforts have been spent litigating the issue of the Guarantors' liability, not Kemper's liability.  The court will reduce the amount of attorney's fees accordingly when judgment is eventually entered against Kemper.  But the court will not reduce the 18% default interest rate, because even if judgment had been entered against Kemper at the outset of this litigation, that judgment would have provided for the contractual 18% rate.  *See* Tenn. Code Ann. § 47-14-121 ("[W]here a judgment is based on a note . . . fixing a rate of interest . . ., the judgment shall bear interest at the rate so fixed.").  If Kemper wanted relief from this interest rate, it could have paid Crossville the amount owed.

The defendants also argue that the attorney's fees and interest recoverable from the individual defendants should be reduced, because they are not liable for the entirety of the Second Note.  (*Id.* at 12-13.)  This argument is unpersuasive.  The Guarantors deny liability for any amount under the Second Note,[19] and the plaintiff's counsel would have been forced to spend roughly the same number of hours to recover the $36,966.02 for which the Guarantors are

---

[18] Of course, because Kemper is defunct and has no assets (Docket No. 16 at 12), the issue is largely academic.

[19] In its Memorandum regarding the plaintiff's Motion for Judgment on the Pleadings, the court stated that the defendants did not dispute "that the Guarantors are liable for the unpaid portion of the First Note that was incorporated into the Second Note."  (Docket No. 12 at 3 n.5.)  But the defendants' memorandum in support of their Motion for Summary Judgment makes it clear that they do, in fact, contend that the individual defendants owe nothing under the guaranties.  (Docket No. 16 at 10, 12 ("[T]here was no breach of the Guaranties in this case . . . [and the Guarantors] have no liability for the underlying debt.").

liable. Thus, the court will not adjust the fees or interest recoverable from the individual defendants.

**VI.     Unjust Enrichment Claim**

Finally, the defendants argue that the plaintiff's unjust enrichment claim against the Guarantors should be dismissed. (Docket No. 16 at 13-14.) The elements of an unjust enrichment claim are: "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under such circumstances that would be inequitable for the defendant to retain the benefit without payment of the value thereof." *Freeman Indus., LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005).

The evidence here is sufficient to support the plaintiff's unjust enrichment claim. In December 2008, Crossville converted the money owed on Kemper's outstanding invoices into the Second Note. According to the affidavit of Crossville's credit manager, Kemper (specifically, defendant Spar) requested this conversion because the company was experiencing cash flow problems. (Docket No. 19, Ex. 1 ¶ 50.) Clearly, then, the promissory note provided some tangible benefit to the defendants. The evidence submitted by both parties also clearly shows that the parties had, at the very least, discussed the possibility that the individual defendants would guarantee the full amount of the Second Note. (*See* Docket No. 16, Ex. 1 at 11, 23.) But, after Kemper executed the note, the individual defendants waited more than two months to inform Crossville that they would not sign new guaranties. A reasonable juror could find that this delay was inequitable.

The defendants argue that the unjust enrichment claim should fail because (1) a valid contract existed among the parties and (2) any product shipped by Crossville was for the sole benefit of Kemper, not the Guarantors. (Docket No. 16 at 13-14.) It is true that "recovery under unjust enrichment is not available when the parties have a valid contract on the matter at issue." *Hayes v. Washburn*, No. M2006-01135-COA-R3-CV, 2007 Tenn. App. LEXIS 671, at *13 (Tenn. Ct. App. Oct. 31, 2007). For this reason, the unjust enrichment claim against Kemper itself must be dismissed. But, as the court has found, there was no contract between Crossville and the individual defendants regarding the $114,533.43 of principal added to the Second Note. Furthermore, the individual defendants owned Kemper, so there is at least a question of fact as to whether they personally benefitted from the benefits conferred upon the company. Accordingly, the plaintiff may pursue its unjust enrichment claim against the individual defendants.

In sum, the court will dismiss the unjust enrichment claim as to Kemper and will set the claim for trial as to the individual defendants.

## CONCLUSION

For all of the reasons discussed above, the court will grant in part and deny in part the defendants' Motion for Summary Judgment. The court finds that the liability of the individual defendants as guarantors is $36,966.02, plus contractual interest and fees. In addition, the court will dismiss the unjust enrichment claim as to defendant Kemper.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

27